UNITED STATES, Appellee

v

GILBERT G. MANUEL, Private First Class,
U. S. Army, Appellant

16 USCMA 357, 36 CMR 513

*Lieutenant Colonel Jacob Hagopian* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Captain Melvin K. Najarian.*

*First Lieutenant Maurice Jay Kutner* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion

Quinn, Chief Judge:

Charged with assault upon PFC Richard E. Lee with intent to commit murder, the accused pleaded guilty to the lesser offense of assault with a dangerous weapon. The evidence conclusively showed that the accused shot Lee in the back of his head, causing brain damage and permanent loss of visual acuity. The general court-martial convicted the accused of an assault in which he intentionally inflicted grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928, and imposed a sentence which included a dishonorable discharge and confinement at hard labor for five years. The convening authority approved the findings of guilty and the sentence, but a board of review modified the latter by reducing the confinement to three years. On this appeal, the accused contends the law officer "improperly interjected his own ideas and conclusion into the deliberations and findings of the court-martial" to his prejudice.

Instructing on lesser included offenses which the court-martial could consider, the law officer mentioned two types of aggravated assault; namely, assault with a dangerous weapon and an assault in which grievous bodily harm was intentionally inflicted upon the victim. He also instructed the court that, after it had "finally" voted on the findings, it could call him and the reporter into the closed session to assist in "putting the findings in proper form." At the end of the instructions, the presi-dent of the court-martial requested repetition of the lesser offense to which the accused had pleaded guilty. The law officer repeated the elements of assault with a dangerous weapon, and indicated how a finding as to that offense could be expressed by exceptions from, and substitutions in, the language of the specification. After deliberating for approximately three-quarters of an hour, the court-martial called the law officer and the reporter into the closed session. They remained there for thirteen minutes. What transpired appears in the record of trial, as follows:

"LO: Have you reached your findings, Colonel?

"PRES: Yes, sir. Of the Charge and the Specification as it was stated originally, we find that he is not guilty. We find him guilty of a lesser included offense of aggravated assault, in violation of Article 128, and we would ask your assistance in putting our findings in proper order.

"LO: I gave you instructions on two kinds of aggravated assault under Article 128.

"PRES: This is the second one, the other one is assault with a dangerous weapon. The one that we decided on is aggravated assault with intent to inflict grievous bodily harm.

"LO: With intent to inflict grievous bodily harm, that's what you found him guilty of. This would be this way then: 'of the Specification: Guilty, except for the words, "with

intent to commit murder," and you have to add after the word pistol, then, "thereby intentionally inflict grievous bodily harm upon him, to wit:" What is it you found to be grievous bodily harm?

"PRES: Should we write this down?

"LO: I'll write it down for you if you tell me what was the grievous bodily harm.

"PRES: The shot in the head, with the damage to the brain. The permanent neurological damage and effect. The blindness.

"LO: The blindness and the brain damage?

"PRES: Yes, the permanent neurological damage and defect.

"MAJOR EVANS: Did he intend to put a hole in the man's head?

"LO: It is not a question of what he found. It is a question of what you found.

"MAJOR EVANS: I think that it would be that he intended to put a hole in the man's head. We don't know what damage this would do, but this would be grievous bodily harm.

"LO: Have your [sic] agreed on what the grievous bodily harm is?

"PRES: We didn't vote on the grievous bodily harm considering the testimony. It sort of led to the conclusion. . . .

"LO: Two-thirds of you agree then, that the testimony which the neurologist gave is the . . . .

"PRES: This is what constituted the grievous bodily harm.

"LO: That's what I'm getting at. What is it? What is the grievous bodily harm?

"PRES: It is the damage that was done by the shot to the head. The damage to the brain and the visual mechanism of the brain, which was the damage to the head.

"LIEUTENANT KEARNEY: This could be simplified by saying, 'a wound in the head,' or 'damage to

the visual facility,' or something like that. 'To wit: a wound in the head, which inflicted permanent visual damage.'

"LO: I'm turning these words around, but would you state, 'a blindness and brain damage of a permanent nature?'

"PRES: That's right.

"LO: 'Blindness and brain damage of a permanent nature.'

"MAJOR EVANS: A wound to his head.

"LO: What is the grievous bodily harm?

"LIEUTENANT KEARNEY: The fact that he had a head wound, but the actual result of the wound was the visual and brain damage.

"MAJOR EVANS: You are saying that he shot with the full intention of causing brain damage and visual damage.

"MAJOR BENDER: He shot with full intention of inflicting grievous bodily harm. The brain damage just happened as a result of being shot.

"LO: What grievous bodily harm did you decide on.

"PRES: 'To wit: A head wound from a .22 caliber bullet.'

"LO: What we are interested in is the grievous bodily harm? What is it?

"PRES: A wound in the head. A hole in the head. The damage that was caused by the hole being put there.

"MAJOR BENDER: But what would cause the hole?

"CAPTAIN VIENS: It was the result of the assault with the weapon and won't that have to go on the 'to wit' part of the statement?

"LIEUTENANT KEARNEY: 'To wit: a head wound by a .22 caliber bullet.

"LO: Is that what you all agree to?

"PRES: A head wound.

"LO: It will read this way:

**359**

"Of the Specification: Guilty, except the words 'with intent to commit murder,' and adding after the word pistol, the words, 'and did thereby intentionally inflict grievous bodily harm upon him, to wit: a head wound,' of the excepted words, not guilty, of the added words, guilty.

"Of the charge: Not Guilty, but guilty of a violation of Article 128.

"PRES: Of the Specification and the Charge: Not Guilty . . . .

"LO: Don't even use that part.

"PRES: Oh! Finds you:

"Of, the Specification: Guilty, except the words 'with intent to commit murder,' and adding after the word pistol, the words, 'and did thereby intentionally inflict grievous bodily harm upon him, to wit: a head wound,' of the excepted words, not guilty, of the added words, guilty.

"Of the Charge: Not guilty, But guilty of a violation of Article 128.

"LO: That's all?

"PRES: Yes, sir, thank you.

"(Whereupon the law officer and the court reporter withdrew from the closed session at 1444 hours, 24 June 1965.)"

Two minutes after the law officer and the reporter left the closed session, the court members returned to the courtroom. The president announced that by appropriate vote, the court had found the accused guilty of the specification, with the exceptions and substitutions expressed by the law officer and repeated by the president in the final part of the closed session conference. Appellate defense counsel contend these findings resulted from the law officer's repeated questions and improper comments.

Civilian practice does not authorize the judge to confer privately with the jury on the form of its verdict. See Rice v United States, 356 F2d 709 (CA 8th Cir) (1966). Almost two centuries of experience with this practice, in both the Federal and State courts, has witnessed relatively few instances of confused or unintelligible jury verdicts.

Congress, however, has not seen fit to adopt the practice for general courts-martial. The Uniform Code of Military Justice expressly empowers the court members to call the law officer into the closed session to assist them in putting their findings into proper form. Articles 26 and 39, Code, supra, 10 USC §§ 826, 839, respectively. The practice is fraught with danger. Comments by the law officer may go beyond the very narrow limits of assistance with legal form to become part of the court-martial's deliberations. Such participation in the deliberative process is presumptively prejudicial to the accused. United States v Allbee, 5 USCMA 448, 452, 18 CMR 72. The presumption is not conclusive; but if it is to be overcome, the record of trial must convincingly demonstrate the absence of any fair risk that the court members were influenced in their deliberations by the law officer's words and actions. United States v Saunders, 8 USCMA 585, 25 CMR 89. Consequently, the law officer called into a closed session must be mindful of the danger and be constantly alert to his obligation to do and say nothing beyond transcribing the court members' findings into appropriate legal form.

Neither the verity nor the completeness of the transcript of the closed session discussion is disputed. We must, therefore, accept as true the president's statement that the court members had made their findings before the law officer was called into the closed session. United States v Solak, 10 USCMA 440, 443, 28 CMR 6. The findings were clearly spelled out in the president's answers to the law officer's questions. They were, that the court members had found the accused not guilty of the specification as "stated originally," but guilty of the lesser offense of an aggravated assault involving an intent to inflict grievous bodily harm. Not skilled in law, the president understandably did not use the precise legal description, but there was no mistaking the offense he meant. The offense "decided on" by the court members was not "assault with a dangerous weapon,"

but "the second one" of the two aggravated assaults, that is, "assault with intent to inflict grievous bodily harm," as a result of which the victim suffered "permanent neurological damage" and "blindness."

Unquestionably, the law officer should not have allowed his colloquy with the president to expand into a general discussion with other court members. His failure to confine the conversation, however, does not indicate any attempt to influence the findings. To us, as to the law officer, the president's description of the findings made by the court members adds up to the offense of assault in which grievous bodily harm was intentionally inflicted. True, the president indicated that no separate vote had been taken by the members on the nature of the harm suffered by the victim, but his remarks leave no doubt that the members who voted for the declared findings understood they included damage to the victim's brain and visual acuity, caused by the shot fired by the accused into the back of the victim's head. As far as the law officer's conduct and comments are concerned, the record of trial compellingly demonstrates he effected merely "particularization of the form of what had already been clearly determined in general." United States v Smith, 3 USCMA 680, 684–685, 14 CMR 98; United States v Saunders, supra.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring in the result):

I concur in the result.

In view of the disagreement between my brothers, I deem it necessary to express my views separately.

There is no dispute between them as to what occurred in the closed hearing; rather, their differences arise over the interpretation placed thereon. We are here dealing with a procedure which is found only in military law, expressly provided for in Article 39, Uniform Code of Military Justice, 10 USC § 839, and for which there are no civilian precedents.

The cited Article provides in pertinent part that "After a general court-martial has finally voted on the findings, the court may request the law officer and the reporter to appear before the court *to put the findings in proper form*, and those proceedings shall be on the record." (Emphasis supplied.)

All other proceedings must be conducted in the presence of the accused and counsel for both sides. Not only has this private conference between the law officer and the members of the court no counterpart in civilian practice, but Rule 43 of the Federal Rules of Criminal Procedure specifically provides that the defendant shall be present at every stage of the trial. This rule prohibits the trial judge from communicating in any way, either before or after it has begun to deliberate, when the defendant is absent. As stated by Judge Learned Hand in United States v Compagna, 146 F2d 524, 528 (CA2d Cir) (1944):

"... it is most undesirable that anything should reach a jury which does not do so in the court room. This is, indeed, too well settled for debate [citations omitted]. But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity."

See also the annotations to State v Murphy, 17 ND 48, 115 NW 84, 17 LRA (New Series) 609 (1908). But see Shields v United States, 273 US 583, 71 L ed 787, 47 S Ct 478 (1927), and the dissent in Walker v United States, 322 F2d 434, 437 (CA DC Cir) (1963); cf. Rice v United States, 356 F2d 709 (CA 8th Cir) (1966).

As so aptly noted by the Chief Judge, in his opinion, almost two centuries of experience with this practice, in both the Federal and State courts, has witnessed relatively few instances of confused or unintelligible jury verdicts. However, since the Congress has seen fit to adopt a rule for the military which is such a distinct departure from the civilian practice, its application, in light of the consequent danger to the judicial processes by any departure therefrom,

should be strictly construed. Law officers would be well advised to hew strictly to the letter of this law, for findings in improper form may be corrected even after announced in open court. United States v Downs, 4 USCMA 8, 15 CMR 8. For a discussion of the rule and its application, see United States v Berry, 1 USCMA 235, 2 CMR 141; United States v Keith, 1 USCMA 493, 4 CMR 85. Cf. United States v Allbee, 5 USCMA 448, 18 CMR 72; United States v Saunders, 8 USCMA 585, 25 CMR 89.

Judge Ferguson is correct when he points out that there is no such offense under the Code as *assault with intent to inflict grievous bodily harm*,[1] (United States v Woodson, 3 USCMA 372, 12 CMR 128), the verbiage utilized by the president in initially informing the law officer of the wording of the court's findings. But I believe he places too much emphasis on these words and not enough on the previous colloquy wherein the president told the law officer the court had found the accused not guilty of the offense charged but guilty of the "lesser included offense of aggravated assault, in violation of Article 128 . . . the second one." Since he also said that "the other one is assault with a dangerous weapon" (to which the accused had entered a plea of guilty), he could, as the Chief Judge points out, have been referring only to the offense instructed upon—*intentionally inflicting grievous bodily harm.*

While it might appear to those untrained in the law that the difference between the verbiage used by the court president and the offense delineated under the second section of Article 128 is a mere play on words, there is in fact a substantial difference. In the one there need be no injury at all, merely the intention to inflict, while in the offense for which the accused was convicted, an injury to the body of the victim must have been intentionally inflicted and of such a nature as to be considered grievous. It was for this reason that the law officer next inquired

of the president, "What is it you found to be grievous bodily harm?" to which the latter replied, "The shot in the head, with the damage to the brain. The permanent neurological damage and effect. The blindness."

At this point the law officer's work was done for the president speaks for the court members. He could have informed the president of the manner of making the announcement of sentence and retired from the closed session. Before he could do so, however, there was an almost immediate question from one of the court members which apparently raised a doubt in his mind as to whether a vote had been taken and a specific finding made as to the nature of the grievous bodily harm. Further inquiry developed that a vote had not been taken on the nature of the grievous bodily harm, but, according to the president, "considering the testimony. It sort of led to the conclusion."

The Chief Judge believes the president's remarks leave no doubt that the members who voted for the declared findings understood they included damage to the victim's brain and visual acuity, caused by the shot fired by the accused into the victim's head. Judge Ferguson, to the contrary, believes the transcript to indicate a wide difference of opinion as to the nature of the harm intentionally committed and that the Congress did not intend guilty and criminal sanction to be predicated on "understanding."

In his instructions on the elements of aggravated assault, the law officer correctly told the court members that in order to find the accused guilty of that offense they must find:

". . . the accused, without justification or excuse and with unlawful force or violence, inflicted grievous bodily harm upon . . . [the victim]; and,

"That such grievous bodily harm was intentionally inflicted by the accused."

He immediately thereafter informed the court that grievous bodily harm means serious bodily injury; not minor injury, but serious damage to internal

---

[1] Such an offense was punishable under Article of War 93 but was eliminated from the Code.

362

organs, or other serious bodily injuries. He had previously informed the court that when grievous bodily harm is inflicted by means of intentionally using force in a manner likely to achieve that result, it may be inferred that the grievous bodily harm was intended.

When a court retires to deliberate on findings it votes on the offense as charged, or a lesser included offense, in accordance with the elements and other instructions as given by the law officer. It does not vote on the specific elements in turn, but rather on the whole of the offense. In the case at bar, it is obvious the members agreed that the accused unlawfully committed an assault, that grievous bodily harm to the victim resulted therefrom, and that such harm was intentionally inflicted. The extent of the injuries, permanent partial blindness, stands unrebutted on the record. In fact, counsel conceded this in his argument to the court and did not question the doctor who testified as to the operation he performed on the victim and the resultant neurological deficit. The entire thrust of the defense was geared to the accused's lack of intent to injure the victim.

While in some cases it might be desirable or even necessary to spell out with particularity the basis for the court's determination, I do not believe this case falls within either category. The law officer's persistent questioning only served to confuse the members as to their obligations on findings as evidenced by their replies. It does, however, accentuate the wisdom of the civilian rule prohibiting contact between judge and jury except in open court.

To the extent that the law officer steered the discussion along lines calculated to fill what he considered a void in the court's findings—albeit unnecessarily—he violated the letter of the Code and committed error. In our early cases we considered this a matter of general prejudice. United States v Keith, supra. Subsequently, however, we modified this position and in United States v Allbee, supra, announced that such participation would thereafter give rise to a rebuttal presumption of prejudice.

Consequently, in my view of the case, the accused was not prejudiced by the law officer's actions and I would affirm the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

My brothers overlook the fundamental problem presented in this case. True it is that Uniform Code of Military Justice, Article 39, 10 USC § 839, permits the law officer to enter into closed session with the court-martial and assist it in recording its findings. But the prerequisite to such assistance is that it must have reached a valid finding. Here, it did not do so, and it became the law officer's duty to reopen court and, after advising it to that effect, resubmit the issues on proper instructions. Instead, he chose skillfully to convert an improper verdict into a proper one through thirteen minutes of continuous questioning. The result is his finding of guilty and not that of the court. I hardly believe that compelling evidence of guilt covers such a situation, and I would reverse.

There is no difference between us on the facts of the case. The entire transcript of the closed hearing is set out in the principal opinion. To even the casual reader, it makes explicit the nature of the court-martial's finding. Thus, at the outset, the president declared, "The one that we decided on is aggravated assault with intent to inflict grievous bodily harm." The law officer expressly noted this was the offense, but immediately converted it into an aggravated assault whereby grievous bodily harm was intentionally inflicted. When he did so, the court made it even plainer that it had not found the latter offense, for each member speaking expressed differing views on the nature of the grievous bodily harm which was allegedly intentionally inflicted. Major Evans raised the question whether accused intended "to put a hole in the man's head." The president then stated for the court that, *"We didn't vote on the grievous bodily harm considering the testimony."* (Emphasis supplied.) Another member then said the court had found only that "He [the accused] shot

**363**

*with full intention of inflicting grievous bodily harm."* (Emphasis supplied.)

Despite all these indications that the court had purported to find the accused guilty only of assault *with intent to inflict grievous bodily harm,* the law officer persisted in his discussions and recorded a verdict of *assault whereby grievous bodily harm was intentionally inflicted.* None of the closed session proceedings were divulged to either counsel, and the verdict as formed by the law officer was announced in open court. Accused was sentenced thereon.

There is no offense under the Uniform Code of *assault with intent to inflict grievous bodily harm.* Such an offense was punishable under Article of War 93, 10 USC (1946 ed) § 1565. United States v Cromartie, 1 USCMA 551, 4 CMR 143. When the Code was enacted, however, aggravated assaults were limited to two types—assaults with a dangerous weapon and assaults *whereby grievous bodily harm was actually and intentionally inflicted.* Code, supra, Article 128, 10 USC § 928. Thus, we specifically noted in United States v Woodson, 3 USCMA 372, 12 CMR 128, at page 375:

". . . We further believe Congress concluded that Articles 128 and 134 of the Code carved out all the necessary gradations of assault and that further refinement was not desirable *as the previous offense of assault with intent to inflict great bodily harm was eliminated from the 1951 Code."* [Emphasis supplied.]

And, in United States v Burns, 16 CMR 922, it was subsequently stated, at page 925:

"Although this offense was long recognized in military law prior to the Uniform Code of Military Justice, and the Congress obviously was aware of this fact, *the crime of assault with intent to do bodily harm was omitted from the 1951 Code.* In the face of these facts, it appears reasonably certain that the reason why Congress did not denounce assault with intent to do bodily harm as an offense in violation of the Uniform Code is that, since all of the degrees of assault deemed desirable had already been covered in the Code, the Congress intended to eliminate this traditional offense therefrom. This is in accord with generally accepted principles of statutory construction (Crawford Stat Const, sec 326). . . .

*"In view of the foregoing, we are driven to the inescapable conclusion that assault with intent to inflict grievous bodily harm is no longer an offense cognizable by military law."* [Emphasis supplied.]

Under Code, supra, Article 128, aggravated assault must either be one with a dangerous weapon—expressly excluded by the court-martial—or one whereby grievous bodily harm has been intentionally inflicted. There is no other degree of the crime between these two. The latter, which is that announced by the court following its deliberations with the law officer in closed session, specifically requires a finding that grievous bodily harm was in fact intentionally inflicted. Code, supra, Article 128; United States v Malone, 4 USCMA 471, 16 CMR 45. Yet, the president excluded such a finding by pointing out to the law officer, "We didn't vote on the grievous bodily harm." And the long speculative discourse thereafter between the military judge and the other members bears out the president's statement.

In short, then, what we have presented here is, as my brothers themselves characterize it, a finding of guilty of " 'assault with intent to inflict grievous bodily harm,' " which is clearly not an offense under the Code. (Emphasis supplied in part.) United States v Woodson, supra; United States v Burns, supra. Omitted entirely from the court's attempted finding was the necessary element of actually finding that grievous bodily harm was intentionally inflicted. Thus, we have nothing more than a defective verdict which the law officer could not in anywise transmute into an effective basis for punishment.

I have not overlooked my brothers' rationale, but I believe they misapprehend what was done here. They make no mention of our holding in *Woodson,* supra, nor can the president's language be explained away by the simple obser-

vation "the members . . . understood . . . [the findings] included damage to the victim's brain and visual acuity." The transcript indicates a wide difference of opinion as to the nature of the harm intended to be done. Moreover, Congress did not intend guilt and criminal sanctions to be predicated on "understanding" or, worse, our "understanding" of the members' "understanding," but upon a properly instructed judicial body voting in closed session upon all elements of the offense charged, with two-thirds concurring as to each finding of guilty. Code, supra, Articles 51, 52, 10 USC §§ 851, 852. Such conditions are not met when the law officer takes a verdict in the manner depicted here.

I would reverse the decision of the board of review and remand the case for a rehearing or, in light of accused's guilty plea to assault with a dangerous weapon, affirmance of that lesser offense and reassessment of the sentence.